STATE, EX REL. JOHN W. HARRIS ET AL., APPELLANTS, V.
JAMES F. HANSON ET AL., APPELLEES.*

FILED FEBRUARY 20, 1908.   No. 15,511.

1. **Eminent Domain:** DRAINAGE. An act of the legislature, appearing
as chapter 153, laws 1907, provides that, "whenever it will be
conducive to the public health, convenience or welfare either to
drain any wet land, or to drain any land subject to overflow by
water, or any land which will be improved by drainage, or to
build or construct any dyke or levee to prevent overflow by water,
* * * a drainage district may be formed * * * for the
purpose of inaugurating, constructing, controlling and maintain-
ing said work or works of public improvement," and providing
that such drainage district may be formed by a majority vote of
the property owners interested, the boundaries of the district
being determined by the county commissioners, who are required
to fix the same "with a view to promoting the interest of said
drainage district, if formed, and with a view to doing justice and
equity to all persons," and further providing for the taxation of
property benefited for the purpose of raising revenue to pay for
such improvements, and that the district, when formed, may con-
demn private property for its use in constructing drains, dykes,
or levees. Said act will not permit the organization of a corpora-
tion in furtherance of private interests, and will not permit the
taking of property for private purposes.

2. ———: ———. The phrase, "with a view to promoting the interest
of said drainage district," used in said act relative to the duties
of the county commissioners in establishing the said district,
means the public interest, and not the private advantage to be
gained by any property owner.

3. **Elections:** DRAINAGE DISTRICTS. Section 22 of the bill of rights
(Const., art. I), providing that "all elections shall be free, and
there shall be no hindrance or impediment of the right of a
qualified voter to exercise the elective franchise," does not apply
to an election upon the formation of a drainage district, nor one
for the election of officers therefor.

4. **Drains:** LEGISLATIVE ACTS. The constitution does not prohibit con-
temporary legislative acts providing different modes for the
formation of drainage districts.

5. ———: ESTABLISHMENT. The establishment of the boundaries of a
proposed drainage district is *prima facie* evidence that the county
commissioners proceeded regularly in the establishment thereof
and that all conditions precedent have been complied with.

* Rehearing allowed. See opinion, p. 738, *post.*

APPEAL from the district court for Dodge county: JAMES G. REEDER, JUDGE. *Affirmed.*

*F. W. Button* and *I. L. Albert,* for appellants.

*Courtright & Sidner, contra.*

*T. F. A. Williams, amicus curiæ.*

EPPERSON, C.

This action is one in the nature of *quo warranto* to determine whether or not the Farmland, Fremont & Railway Drainage District, of which the defendants are, or purport to be, the officers, is a legally existing corporation. The district was organized under the provisions of an act of our last legislature, published as chapter 153, laws 1907. The constitutionality of this act is questioned. It is in part as follows:

"Section 1. Whenever it will be conducive to the public health, convenience or welfare either to drain any wet land, or to drain any land subject to overflow by water, or any land which will be improved by drainage, or to build or construct any dike or levee to prevent overflow by water, or to construct, straighten, widen, deepen or alter any ditch, drain, stream, or watercourse, or to riprap or otherwise protect the bank of any stream or ditch, or to construct, enlarge, extend, improve or maintain any system of drainage, or to construct, enlarge, extend, improve or maintain any system of control of surface-water or running water, or to do any two or more of said things jointly, then a drainage district may be formed and may proceed as hereinafter provided, for the purpose of inaugurating, constructing, controlling and maintaining said work or works of public improvement.

"Section 2. When the district proposed contains real estate owned by less than twenty persons or corporations, one-fourth of said number shall be sufficient to petition for the formation of such district. When there are more

than twenty such owners, ten or more owners of real estate therein may sign a petition for the formation of such district, and file said petition with the county clerk of the county having the largest body of land within said proposed district. Said petition shall suggest the boundaries of said district, the number of directors that said district shall have, if formed, and the amount of bond each shall give."

"Section 4. Thereupon the board of supervisors or commissioners of such county shall take to their assistance the county surveyor of said county and shall determine whether or not the boundaries of said proposed district are reasonable and proper, and if said board find that the boundary line of said district should be changed, they shall change the same and fix the boundary line where the same, in the judgment of said board, should be fixed with a view to promoting the interest of said drainage district, if formed, and with a view to doing justice and equity to all persons. Any one asking shall be given a hearing as to the boundary. Said board shall also determine the number of directors that said district shall have, if formed, and the amount of the bond to be given by each, and shall make a record of their action.

"Section 5. Thereupon the county clerk of said county shall publish a notice once each week for three weeks in a newspaper published at the county seat of each of the counties having land within the proposed district, which notice shall state the filing of said petition; that it is filed under the provisions of this law, giving the title hereof in full; the boundaries of said proposed district as fixed by said county board; that an election will be held at the office of the county clerk between the hours of 8 o'clock A. M. and 6 o'clock P. M. on a day named therein; that at said election the question of the formation of said district shall be determined, and a board of directors elected, giving the number of such board, said board to take office contingently on the formation of said district."

Section 7 is in part as follows: "At all elections the

county clerk and such assistants as he shall choose shall constitute the election board and the canvassing board. Any person may cast one vote on each proposition to be voted on for each acre of land or fraction thereof and for each platted lot which he may own or have an easement in, as shown by the official records of the county where said land or lots may be. Any corporation, public, private or municipal, owning or having an easement in any land or lot may vote at said election, the same as an individual may. The executor, administrator, guardian or trustee of any person or estate interested shall have the same right to vote." It is unnecessary to further quote from the act at this time. Other provisions will hereafter be set forth as necessity requires.

It is contended by plaintiffs that by this act the legislature delegated to private individuals the power to determine the necessity of the improvement, and therefore it is special legislation prohibited by the constitution. And, again, it is argued that, inasmuch as a few individuals owning the greater acreage of a district could control the same against the wishes of the majority, the enforcement of the act would operate in the taking of property without due process of law, and would amount to taxation without representation, and is against public policy. It is argued that the act must fail because the right to vote for the establishment of the district and for officers is limited to property owners. Complaint is made that it provides for or permits the taking of property for private purposes; in other words, that there is no legal provision made for determining whether or not a proposed district would be conducive to the public health, convenience or welfare.

The most important question for determination is whether the act standing alone would permit the formation of districts solely for the advancement of private interests, or is it operative only in districts, the formation of which are by some legal means ascertained to be conducive to the public health, convenience or welfare. If

the former, then without doubt the law is defective; if
the latter, it is not subject to this objection. The act in
controversy provides for the reclamation and protection
of lands by the organization of districts upon which cor-
porate functions are imposed, and, if the act is valid, such
districts become corporations. To meet the expenses of
such improvements, funds are raised by the levy of taxes
upon property benefited, and, moreover, the district may
condemn private property for its use in constructing
drains, dykes or levees. That an individual may become
the beneficiary of the proposed improvement does not alone
make the establishment of a drainage district a private
instead of a public enterprise. And the fact that many
individuals are interested from a pecuniary standpoint,
that their property is increased in value, thereby adding
to the wealth of the state and correspondingly contribut-
ing to the general revenues, go to establish such an enter-
prise as one of public welfare. That the power of the state
exists to promote the public health, benefit and welfare by
the construction of drains, dykes, levees and the making
of other similar improvements can no longer be questioned.
Public health, convenience and welfare, the promotion of
which is ever essential, mean the effect upon the people
of the particular vicinity concerned. In contrast to the
benefits of the few, it means those things which benefit
the many. It is within the power of the legislature to
further the public health, convenience or welfare by the
enactment of drainage laws or providing for the protec-
tion of property by dykes and levees. In *Neal v. Vansickle*,
72 Neb. 105, this court had before it for judgment chapter
116, laws 1903, which provided for the formation of drain-
age districts for the reclamation and protection of swamp,
overflowed or submerged lands, etc. The body of the act
provided that the district must contain at least 640 acres.
The constitutionality of the act was questioned. So far
as the question relating to the right of public corporations
organized for the reclamation of lands by taxation for
improvements and the exercise of eminent domain, that

case is similar to this, and reference is made to the opinion, which we need not quote. It was there held: "The drainage and reclamation of large tracts of swamp and overflowed or submerged lands is a matter of general public utility and concern, for which the legislature may provide by the creation of local administrative organizations or political corporations." It will be observed that in the act of 1903 no provision was expressed that it should apply only to districts wherein the public health, convenience or welfare would require it. Yet it was self-evident that the reclamation of large tracts of land would subserve the public welfare. That such is true has become a maxim —a public policy, which is recognized by all the courts. It would seem, therefore, that any act of the legislature which provides for the reclamation or protection of large tracts of swamp, overflowed or submerged lands could not be open to the objection that its enforcement would result in the taking of property for private purposes. The act of 1907 applies to any land, whether it be a large tract or small, the protection of which would be a public utility. But the fact that the tract is of small area does not necessarily make its reclamation any the less a public benefit. The act contains sufficient safeguards to prevent its being subservient to private interests. We cannot see the dangers which plaintiffs contend are liable to result from its enforcement. A few individuals cannot for their private purposes create a drainage district and impose the burdens thereof upon their neighbors. Neither can a few or many acting in their individual interests prescribe the boundaries of the proposed district. By their petition they only suggest the boundaries; whereupon the county commissioners, with the assistance of the county surveyor, shall determine the same. When we consider that the act expressly provides that such drainage district can be created only "whenever it will be conducive to the public health, convenience or welfare (sec. 1)," and, further, as provided in section 4 of the act, that in fixing the boundaries the board shall determine the same "with a view to

promoting the interest of said drainage district, if formed, and with a view to doing justice and equity to all persons," we can reasonably conclude that the formation of the district will in the opinion of the county commissioners be conducive to the public health, convenience or welfare. If the boundaries suggested in the petition of the promoters are not such as the law contemplates, the county board should change the same to include such additional or different territory, the protection of which would in their opinion serve public interest in contradistinction to private gain. And, if the county board find it impossible to establish the boundaries of a district, the interest of which would be promoted, it need proceed no further, and all proceedings would terminate. The phrase "the interest of said drainage district," used in section 4 of the act, means the public interest of the district, and not the private advantage to be gained by any property owner. As an additional safeguard the property owners are given a voice in the incorporation and establishment of the district. After the county board has fixed the boundaries an election is called in which the property owners vote for or against the incorporation thereof. Section 8 of the act provides: "If a majority of the votes cast at said election shall be in favor of the formation of said district it shall be conclusive that the formation of said district, and the work that may be done under the supervision of the board of directors, will be for the public health, convenience and welfare." The submission of the question to the property owners of a district established by a duly authorized tribunal is not a violation of any constitutional provision. That the legislature may delegate to administrative officers the power to determine whether a particular proposed improvement will be conducive to the public health, convenience or welfare is an established rule. The same function may be delegated to the electors of a municipality. We know of no reason why the property owners of a district established by the county board should not be competent to determine for themselves whether or

State v. Hanson.

not they shall incorporate, and thereby at their own expense establish a system of drainage and dyking for the reclamation of land, the doing of which will be conducive to the public welfare.

It is argued under the provisions of the act that the vote provided for therein must be taken as conclusive of the question of public utility, when in fact the voters are not required to express themselves upon that question, but instead may vote as their individual interests dictate. If we were to consider the election alone decisive of the question of public utility, we could not say that the act was for this reason invalid. In *Board of Directors v. Collins,* 46 Neb. 411, this court, quoting from the opinion in *In re Bonds of Madera Irrigation District,* 92 Cal. 296, say in reference to the organization of an irrigation district: "We know of no more appropriate mode of such indication than the affirmative vote of those who are to be affected by the acceptance of the terms of the act. * * * Inasmuch as there is no restriction upon the power of the legislature to authorize the formation of such corporations for any public purpose whatever, and as when organized they are but mere agencies of the state in local government, without any powers except such as the legislature may confer upon them, and are at all times subject to a revocation of such power, it was evidently the purpose of the framers of the constitution to leave in the hands of the legislature full discretion in reference to their organization. * * * In determining whether any particular measure is for the public advantage it is not necessary to show that the entire body of the state is directly affected thereby, but it is sufficient that that portion of the state within the district provided for by the act shall be benefited thereby. The state is made up of its parts, and those parts have such a reciprocal influence upon each other that any advantage which accrues to one of them is felt more or less by all of the others." Granting that each person entitled to a vote would express himself as his private interests dictate, and the result of the election shows a

majority of the votes cast favorable to the formation of the district, we then have the established fact that the owners of the greater number of tracts or acres of land involved are each of the opinion that his own private interests will be best subserved by the formation of the district. This, in our opinion, establishes the fact that the organization thereof will be conducive to the public welfare. The public is but an aggregation of individuals, and it is unnecessary that the aggregation be composed of the people of an entire state, county, township or city. The common weal of a particular vicinity is a matter of public concern. The protection of land against floods and overflow and its reclamation from inundations, where an entire vicinity is benefited, is conducive to the public interests. In such cases the interests of many individuals amalgamates into and becomes a matter of general welfare, the promotion of which forms one of the purposes for which the government exists. The reciprocal influence which the improvement of each tract of land has upon the other is combined for the advantage which accrues to all; their being united is a matter of public utility when, were an individual alone affected, it would be considered but a mere private advantage. We are convinced that the formation of a reclamation district, the boundaries of which are fixed by county commissioners, upon the majority vote of the property owners of the district, is not in contravention of any constitutional provision, and does not contemplate or permit the furtherance of private interests. That part of section 8 quoted which declares that the formation of the district shall be conclusive that all the work that may be done under the supervision of the board of directors will be for the public health, convenience or welfare is not before us for consideration. Undoubtedly, were the board to undertake some work which in fact would not further the interests of the district, the provisions of the act would not prevent the granting of proper relief. But the possibility of such conduct on the part of the board does not require the annulment of the act.

State v. Hanson.

Relative to this election, a further objection above referred to must be considered. The act in question provides that any person may cast one vote for each acre of land or fraction thereof, and for each platted lot which he may own or have an easement in. This it is argued is a violation of section 22 of the bill of rights, which reads: "All elections shall be free; and there shall be no hindrance or impediment to the right of a qualified voter to exercise the elective franchise." Section 1, art. VII of the constitution provides: "Every male person of the age of twenty-one years or upwards belonging to either of the following classes, who shall have resided in the state six months, and in the county, precinct, or ward for the term provided by law, shall be an elector: First. Citizens of the United States. Second. Persons of foreign birth who shall have declared their intention to become citizens conformably to the laws of the United States, on the subject of naturalization, at least thirty days prior to an election." It is argued that the officers of the drainage district are public officers, and that the act is contrary to the sections of the constitution last above cited, in that the electors under section 1, art. VII, are barred from participating in the election for the establishment of the district, and for the officers thereof. In *State v. Cones*, 15 Neb. 444, it is held that the act allowing women possessing the qualifications therein prescribed to vote at school meetings is not in conflict with the constitution, and is valid. It is said in the opinion that an examination of the constitution will convince any one that the provisions in regard to elections were not intended to apply to school districts. In *Board of Directors v. Collins*, 46 Neb. 411, our Nebraska irrigation law was held to be constitutional. That law provides for the formation of irrigation districts by a vote of the people, and expressly limits the right to vote to those who own not less than ten acres of land within the proposed district. It is apparent that the constitutional qualification of electors was prescribed in that instrument for the purpose of determining who is entitled to vote for the

officers prescribed by the constitution itself. And, again, a reclamation district could be established and put into operation without the calling of an election. The legislature might have chosen some other mode for the formation of the district, which, if reasonable in its terms, would be effective without the calling of an election of property owners. It might have been left to an administrative body such as the county board. Because the legislature chose this particular mode, it cannot be said that the formation of the district was illegal because electors of the district owning no real estate were barred from participating therein, or because each property owner was given a vote for each acre or lot of land he owned. The legislature may provide for the election of officers not named in the constitution by means other than the popular vote of electors. The act seems to be somewhat deficient, in that it provides in section 4, with reference to the establishment of the boundaries of the district by the county commissioners, that "anyone asking shall be given a hearing as to the boundary." But it does not require a notice to be given to the property owners of the time when they may be heard. It would seem that the legislature intended that each property owner should be given a hearing, but neglected to provide an opportunity. This is not a defect which would permit us to declare the act unconstitutional. We cannot see wherein it affects one's property interests. The establishment of the district is not the taking of property. No rights are invaded by the failure of the act in this regard. Notice is given to the interested parties after the county board has established boundaries of the district, and an opportunity is given to all at that time to vote for or against the incorporation of the district.

It is suggested that the act is an attempt to amend existing law without repealing the same. By section 31 it is expressly stated: "None of the provisions of this act shall be construed as repealing or in anywise modifying the provisions of any other act relating to the subject of drainage." Thus we see that it expressly avoided an attempt

to amend or to repeal any part of any existing law pertaining to the question of drainage. We fail to see wherein this act contravenes section 11, art. III of the constitution, which forbids that any law shall be amended unless the law sought to be amended be repealed, as contended for by the plaintiffs herein. On the contrary, it seems that the legislature by this act and the act of 1905, ch. 161, have provided different modes for the organization of reclamation districts, but this is not prohibited by the constitution. The interested parties may in localities wherein either law is applicable choose whichever mode they desire for the organization of their district. Neither does the act by implication or otherwise repeal any of the provisions of the general corporation law. Indeed, it seems that the general provisions are inadequate to meet the needs of drainage districts, and the act of 1907 must be taken as supplemental and complementary to all other laws pertaining to the formation of corporations.

Plaintiffs' contention that the act authorizes the taking of private property for private use is incident to and based upon his other contention that the act permits the organization of a district for the furtherance of private interest. But, as shown above, the operation of the law will be consistent with the expressed intention of the legislature, and will not permit of the taking of property by private individuals or corporations for their own personal benefit. The organization under the act and the operation of the district once established will, as we have attempted to show, subserve public interests, and the property taken and taxes imposed by reason thereof will not be a violation of the constitution.

But it is contended that, if the act is constitutional, plaintiffs should prevail because of certain irregularities in the formation of this particular district. It is alleged in the petition "that the county commissioners made no finding that said district, if formed, would be conducive to the public health, convenience or welfare as required by law," and in the answer a conclusion of the pleader is

stated in effect that the county commissioners had no power to consider the matter; defendants' contention being that the law leaves to the voters the power to determine this jurisdictional question. The court is not bound by the conclusions of law pleaded by the defendants. Plaintiffs' allegation above quoted is not supported by the admission of defendants. If it was the purpose of the petition to allege that the county commissioners made no record of their findings, the plaintiffs' contention is subject to the further objection that none was required. The fixing of the boundaries of the proposed district is *prima facie* evidence that the same were regularly established.

By section 5 of the act, it will be observed that the notice of election is given by the county clerk, who "shall publish a notice once each week for three weeks." The notice here involved was published by the county clerk in a paper published in Dodge county, the first publication thereof being on May 23, 1907, and the last on June 5, 1907; and in Douglas county, the first on May 24, and the last on June 7. The election was held June 8, 1907. Plaintiffs contend that the notice of the election is defective, in that the first publication was not at least three weeks prior to the election. At first glance, there seems to be some confusion among the decisions of this court as to the notice necessary to be given under statutory provisions similar to that here considered. There are statutory provisions requiring notice of various proceedings to be made by publication for different periods of time, some of which have been considered by this court. In *Davis v. Huston*, 15 Neb. 28, it was held that the statutory provision, "the publication must be made four consecutive weeks," meant that the notice "should be printed or inserted in a weekly newspaper once each week for four weeks successively, and that the publication is deemed complete upon the distribution of the newspaper containing its fourth successive weekly insertion." In *Alexander v. Alexander*, 26 Neb. 68, an act providing for the publication of a notice three weeks successively previous to the time appointed is complied

with by a publication once each week for three successive weeks; in other words, three weekly publications, and the last publication need not necessarily be 21 days from the date of the first. In that case the hearing of which the publication in controversy gave notice was only 16 days later than the date of the first publication. In *State v. Cherry County*, 58 Neb. 734, this court had before it for consideration section 27, art. I, ch. 18, Comp. St. 1897, which provided that the mode of submitting certain questions to the people prior to an election "is to be published for four weeks in some newspaper published in the county." It was held that the word "for" means during and that the notice must be published for, or during, four weeks before the election. Section 497 of the code provides that notice of sales of land upon execution shall be given "for at least 30 days before the day of the sale by advertisement in some newspaper printed in the county." It was held in *Lawson v. Gibson*, 18 Neb. 137, that the notice is required to be published during the 30 days. It is required by statute that an application for license to sell intoxicating liquors shall not be considered until at least two weeks' notice thereof has been given by publication. This has been held to require the publication of the notice for two successive weeks, two weeks intervening between the first publication and the hearing of the application.

There is no conflict in the authorities cited. Where the time mentioned by the statute expresses the duration of the notice, the same must be published for and during the time mentioned. Where, however, the time mentioned indicates only the number of times the notice is required to be published, it is satisfied if the notice is published the number of times mentioned. It is apparent that the phrases, "shall publish a notice once each week for three weeks," and "a notice shall be given for three weeks by publication," have different meanings. In the first "for three weeks" limits the number of publications, and in the

other phrase "for three weeks" fixes the period of time during which the publication must be made. *Alexander v. Alexander, supra*, is in point, and should be followed. No valid objection to the constitutionality of the act has been presented.

The lower court found for the defendant, dismissing the plaintiffs' action, and we recommend that its judgment be affirmed.

DUFFIE and GOOD, CC., concur.

By the Court: For the reasons given in the foregoing opinion, the judgment of the district court is

AFFIRMED.

The following opinion on rehearing was filed July 17, 1908. *Former judgment of affirmance adhered to:*

1. **Statutes: CONSTRUCTION.** In construing an act of the legislature, the court will give to it the meaning which it is apparent from the language used that the legislature had in mind when the act was passed.

2. **Drainage Districts: DUTIES OF COUNTY BOARDS.** Chapter 153, laws 1907, provides that, "whenever it will be conducive to the public health, convenience or welfare either to drain * * * any land which will be improved by drainage, or to build or construct any dyke or levee to prevent overflow by water, * * * a drainage district may be formed," the boundaries of which are to be fixed by the county board upon the filing of a petition by interested property owners, and providing that the county board shall fix the boundaries "with a view to promoting the interest of said drainage district, if formed, and with a view to doing justice and equity to all persons." *Held*, That it is a necessary inference from the language used that the board shall determine the public utility of the proposed district, and that it is not the imperative duty of the board to fix the boundaries if the reclamation and improvement of the district would not promote the public health, convenience or welfare.

3. ——: ——. From the language used it is apparent that the legislature intended that the provisions of the act should not be applied except that the county board should prescribe a district, which, if organized and improved, would in fact promote the public health, convenience or welfare.

4. **Elections:** DRAINAGE DISTRICTS. After the county board has fixed the boundaries of a district the reclamation or protection of which would be of public utility, it is competent for the legislature to permit the property owners within the proposed district to determine by vote whether or not they will avail themselves of the benefits of the act, and the provisions permitting none but property owners to vote, and authorizing each owner of real estate to cast a vote for every acre of land or town lot which he owns within the proposed district, and permitting nonresident owners and foreign corporations owning real estate therein to vote upon the question of organization and for the officers of the district are not unlawful, nor does such election call for the exercise of the elective franchise secured to all electors by section 22 of the bill of rights. Const., art. I.

5. **Eminent Domain:** DRAINAGE DISTRICTS. An act of the legislature providing for the organization of a drainage district whenever the same will promote the public health, convenience or welfare, funds for the improvement to be raised by special assessment of the property in proportion to the benefits received, and which provides that notice of assessment shall be served on the property owner giving him the right to appear and be heard and to appeal from the order of the assessing officers, does not amount to the taking of private property for private use, nor for public use without just compensation, nor is it the taking of property without due process of law.

6. **Former opinion** in this case, *ante*, p. 724, adhered to.

EPPERSON, C.

Our former opinion herein is published, *ante*, p. 724, to which reference is made for a statement of the case and for certain parts of an act of the legislature, the constitutionality of which is questioned. Desiring to further consider certain questions presented by this appeal, relators' motion for a rehearing was granted, and those questions were submitted to counsel. The third question related to estoppel of relators, and does not require a discussion here. It would be pertinent only in the event that we found against respondents upon all of the other propositions considered. The other questions are as follows: (1) Does the fact that each owner of real estate may cast a vote for each acre of land or town lot which he owns within the proposed district affect the validity of the act? (2)

Does the fact that nonresident owners, whether they be natural persons or corporations, are given voice in the election affect the validity of the act? * * * (4) Does the act by inference give to county boards the power to determine whether the proposed district and improvements will be for the benefit of the public health, convenience and welfare? (5) Is any discretion vested in the county board as to the formation of a drainage district, or must it fix the boundaries for a district when demanded in accordance with the provisions of the act, if it did not deem it wise to form any district in the vicinity?

We will first consider the fourth and fifth questions presented. The two may be disposed of together. It is well established by the great weight of authority that the drainage of swamp lands, and the construction of dikes and levees for the reclamation and protection of real property, may be provided for by legislation, and that the authority to make such improvements may be conferred upon municipal corporations, upon county boards, upon specially appointed officers, or upon districts which may be organized for that purpose. It is equally well settled that the machinery of the government will be thus placed in operation only when the contemplated reclamation or protection by drainage, or by the construction of dikes and levees and other similar improvements, are necessary in order to promote the public health, convenience or welfare, and that individuals cannot through the agency of the government thus improve their own property when the public health, convenience or welfare will not be promoted thereby. As a general thing, and with very rare exceptions, the government, by thus promoting the public health, convenience or welfare, will incidentally cast special benefits upon the property of individuals which is reclaimed or protected by such drainage or diking or other similar improvements, and it is the consensus of judicial opinion that for this reason the cost and the expense of such improvement may be taxed to the property thus receiving special advantage. Although the reclamation and

State v. Hanson.

protection against flood waters, inundations and overflows
are matters to which the government lends protection by
the taxation of property and by the condemnation of prop-
erty, yet it is necessary that some governmental agency
must be invoked for the purpose of determining whether
or not any proposed improvement will in fact promote the
public health, convenience and welfare. That any such
proposed improvement is one of public utility is a juris-
dictional fact, and without its existence the government
should refuse to lend its aid, and a law which will permit
such improvement in any other case is unconstitutional
and void, because it would permit the taking of private
property to further private interests. Various legislative
bodies have provided different laws and created various
means for determining the question as to whether or not
any proposed improvement by drainage or by the construc-
tion of dikes and levees would in fact be of public utility.
More frequently this duty is conferred upon county boards
of supervisors, occasionally upon officers specially provided
for that purpose, referred to usually as "drainage com-
missioners"; but such matters are within the discretion
of the legislature, and if it has prescribed a rule whereby
the jurisdictional question may fairly be determined by a
competent administrative body the law must be upheld,
and proceedings had in conformity thereto will not be
disturbed by the courts. Reference to our former opinion
will disclose that the act of the legislature, which is
assailed by the relators, recognizes that the improvements
for which the act provides may be made only "whenever it
will be conducive to the public health, convenience or wel-
fare." The act provides for the presenting of a petition
signed by the requisite number of freeholders who own
land within the boundaries of a suggested district. Upon
the presentation of such petition, the county board of
supervisors shall take to its assistance the county surveyor,
"and shall determine whether or not the boundaries of
said proposed district are reasonable and proper, and, if
said board find that the boundary line of said district

should be changed, they shall change the same and fix the boundary line where the same in the judgment of said board should be fixed with a view to promoting the interest of said drainage district, if formed, and with a view to doing justice and equity to all persons."

The fourth and fifth questions above quoted must be answered by an interpretation of this provision of the act in controversy. It is evidently the intention of the legislature that such improvement should not be brought about, except that it be for the public health, convenience or welfare. But is it possible that the specific provisions of the act may be complied with and the expressed intention of the legislature defeated? The county board itself views the property, taking to its assistance the county surveyor. It is not required to take testimony, but upon an examination of the vicinity of the suggested district determines the boundaries thereof. The board is not permitted to take into consideration the private advantage which would be gained by any individual; but, on the other hand, it shall fix the boundaries with a view to promoting the interest of the drainage district, and with a view to doing justice and equity to all persons, and this must necessarily be done with a consideration for the public health, convenience or welfare. Although drainage laws are liberally construed, yet we are of the opinion that a strict construction placed upon this act would not permit us to arrive at any other conclusion. The inference that the county board shall determine the public utility of the proposed improvement is not only permissible, but a necessary construction to be placed upon the language used. It is the board's imperative duty to act upon the presentation of a proper petition. It is not its imperative duty to fix the boundaries if the organization of the district would not promote the public health, convenience or welfare. Counsel for respondents argues, as also does counsel for relators, that the county board has no discretion in the matter; that it is required to fix the boundaries of the district regardless of the public health, convenience and

welfare; and that the question of public utility is to be determined by the owners of the property within the district.   Were we to take his view of this proposition, we could not in all probability support the conclusion we have reached.   Yet he admits that, acting under the provisions of the statute, it would be the duty of the county board to change the boundaries of the suggested district so as to include land the reclamation or protection of which would be of public utility, and that it would be the duty of the board to exclude such land, in the suggested district, the reclamation or protection of which would not promote such public interest.

The legislature is the author of the act.   It appears from the arguments that the act was promoted by the respondents, their constituents, and their counsel.   Their counsel drafted the bill for which the act was introduced, and, although he places a construction upon this provision inconsistent with ours, yet we must give to the act the meaning which it is apparent from the language used that the legislature had in mind when it passed it.   We adhere to the construction set forth in our former opinion.   The legislature might well have said in express terms that the county board should make a finding that the organization of the proposed vicinity would be of public utility; but the inference is strong, from the language actually used, that it was the intention of the legislature that the district should not be organized, except that the county board could prescribe such boundaries for the proposed district, which, if organized and promoted under the provisions of the act, would in fact promote the public health, convenience or welfare.   The supreme court of Minnesota in *State v. Board of County Commissioners,* 87 Minn. 325, 60 L. R. A. 161, had before it for consideration a drainage act which contained no express provision making it the duty of the board to find whether the proposed ditch would be of public benefit, nor is there any express declaration in the act itself that such fact must exist before a ditch may be ordered constructed.   In the opinion we find the

following: "From a very careful and painstaking examination of this act, we are satisfied that but one construction should * * * be given it, and that to the effect that the legislature intended to provide exclusively for the public welfare. It provides that the county commissioners may construct a ditch or drain, when they find the necessity therefor and that the other provisions of the act have been complied with. It provides that the petition shall state the necessity for the ditch, and this must necessarily refer to and mean the public necessity, for only public ditches are authorized to be laid out by the act. No assessments upon lands benefited can be made, except toward the payment of a public ditch; and the theory that a private ditch may be ordered constructed under its provisions is impliedly negatived by almost every section of the statute. Section 31 was undoubtedly embodied therein for the very purpose of indicating that the legislature intended it to apply exclusively to cases where the public health, convenience, or welfare will be advanced. This section provides 'This act shall be liberally construed, so as to promote the public health and the drainage and reclamation of wet or overflowed lands.'" In *Oathout v. Seabrooke,* 159 Ind. 529, it is said: "The seizure of private property by the state, through county commissioners, for the construction of highways and ditches, is an assertion of the right of eminent domain, which can be exercised only in cases where some public benefit is to be subserved. The commissioners have no power to enter upon lands, lay out and construct roads and ditches, when only private interests are involved, and no power to act upon such subject until they have first ascertained, by the means provided by law, that some public benefit is to be promoted thereby."

The act confers upon the property owners of the district the privilege of organizing the district for the purposes of improvement, but, as we view it, the election is not held to determine the question of public utility. The county board does that. The result of the election could

not change this fact.   It is true that the act says: "If a majority of the votes cast at said election shall be in favor of the formation of said district it shall be conclusive that the formation of said district, and the work that may be done under the supervision of the board of directors, will be for the public health, convenience and welfare."   Laws 1907, ch. 153, sec. 8.   Were it not for the action of the county board in fixing the boundaries with a view of forming a district, the improvement of which would promote the public welfare, we would quite agree with relators' counsel that the act is fatally deficient.   The election is called only after the jurisdictional question of public utility is determined, and for this reason alone can the election be considered as conclusive that the reclamation or protection of the district will be for the public health, convenience or welfare.   It would not stand for this even, unless all jurisdictional provisions had been in good faith complied with.   The only purpose for requiring an election is, first, to give to the property owners the privilege of availing themselves of the statute, and thereafter to select officers of the district.   The legislature might have provided for the organization of a district without an election. As will be seen by authorities hereinafter cited, legislatures of some states have conferred upon county commissioners the power to construct drains without giving to interested property owners any vote whatever, either by petition or by ballot, and such legislation has been enforced by the courts.   Our legislature could constitutionally confer upon the county board the power to create a drainage district upon a petition of the property owners, who represent the greater portion of the property within the district, if upon investigation the board find that the public welfare would be subserved.   It is immaterial that the act now before us failed to provide for this expression from the property owners before the determination of the jurisdictional question by the county board.   The county board had authority to consider the question by reason of a petition filed by comparatively a few of the interested

property owners. And acting upon this it proposed a district, the improvement of which would be of public utility.

Then it was that the question of organization was submitted to the interested property owners. Nor is it fatal to the act, nor can we even say that it was unwise legislation, to permit all the property owners, regardless of their location, and although they might be foreign corporations, to have a voice at the election. In fact, it seems fair and reasonable, when the public interest, and not private, is to be promoted by improvements to be paid for by special taxation according to benefits, that all persons, regardless of their place of residence, should have a voice, and their influence be determined by the amount of their holdings. Section 22 of the bill of rights provides: "All elections shall be free; and there shall be no hindrance or impediment to the right of a qualified voter to exercise the elective franchise." Const., art. I. The act under consideration does not call for an exercise of the elective franchise such as is provided for in the constitution. It prescribes a manner by which the property owners may determine what persons shall have charge of the intended improvements. The directors provided for by the act are not public officers, in the sense that they have charge and control of the political affairs of their constituents. This is one of several modes resorted to by the different legislatures in providing a manner for the organization of drainage districts. The formation of the district is not for the purpose of government, but for the purpose of constructing a public improvement, after the proper governmental body has determined that the same would be of public utility. As heretofore said, the law might have provided for the improvement of the district at the expense of the benefited property, without giving to the property owners any vote whatever. Such being possible, it seems immaterial what manner of voting is prescribed, when the legislature sees fit to give that privilege. By an act of the general assembly of Iowa it was provided

that the drainage of land subject to overflow or too wet
for cultivation could be established upon a petition of 100
voters of the county.. It was not required that any of
the petitioners should be the owners of, or interested in,
the land in controversy, nor did the act provide that the
wishes of the landowners should be considered in the
establishment of the proposed drain. *Seibert v. Lovell*, 92
Ia. 507; *Butts v. Monona County*, 100 Ia. 74. In *Roberts
v. Smith*, 115 Mich. 5, the act made no provisions for
notice and hearing to the persons within the assessed dis-
trict or the property owners liable to assessment, and it
was held that this omission from the act did not violate
the constitutional requirement against the using of private
property for public improvements without the consent of
the owner, unless compensation shall first be determined
by a jury of freeholders, and it was further held that said
act did not authorize the taking of property without due
process of law, in that it makes no provision for such notice
and hearing. In *Mound City Land & Stock Co. v. Miller*,
60 L. R. A. 190 (170 Mo. 240), it was held: "Basing the
voting power in a drainage district on acreage, rather than
on membership, is not unlawful." In *People v. Reclama-
tion District*, 48 Pac. 1016 (117 Cal. 114), it was held:
"That the law creating reclamation districts provides that
those who are interested in the land and who must pay for
the improvements shall determine by an election whether
the improvements shall be made, does not constitute an
exercise of the elective franchise, so as to render it void
because requiring a property qualification." In the opin-
ion it is said: "The district, as already said, was part of a
scheme for conducting a public work, and not for self-
government. In regard to street w    and other local im-
provements, it has often been provided that the work shall
only be done upon the application of the owners of a ma-
jority of frontage, or of a certain proportion of the owners
of land; and, if the law had provided that the owners
could elect a committee of their number to superintend
the work, I do not see how it could change the principle.

This could not constitute an exercise of the elective franchise, which is the matter to which the constitutional provisions have reference. The general public has an interest in the reclamation of swamp and overflowed land. Nevertheless, it is one of those public enterprises which results in a benefit to private lands, and therefore the costs are made a charge upon such land. That those who are specially interested and who must pay for the improvement are heard upon the question as to whether it shall be done, and are permitted to appoint those who shall superintend it, is not unusual, nor would it constitute an exercise of the elective franchise." 117 Cal. 114.

The act here in controversy, instead of providing a notice and hearing to the property owners for the purpose of determining the jurisdictional question as to public utility, provided another manner by which the county board should ascertain that fact—by personal examination and investigation, with the assistance of the county surveyor. It is not necessary for this court to determine which plan is the better. The one adopted is adequate. The mere establishment of a drainage district does not deprive any property owner of his property, does not impose taxes against his property, and in no way does it violate his constitutional rights. The question of taxation and assessment is determined by the officers of the district, when it is once organized. They are required by the act to levy the necessary taxes upon the property benefited in proportion to the benefits received, and of this assessment each property owner has notice—is granted a hearing, with the right to appeal. In this system of taxation, and in this only, is there an opportunity to do an injustice to any person concerned, and, if the invasion of any rights is threatened, he has an opportunity to correct it, as other wrongs done in violation of the revenue laws of the state are corrected.

There was a sixth proposition argued upon the rehearing; but, in view of the conclusion we have reached, a discussion thereof is unnecessary. It would be important

only in the event that the court should find that the property owners had the power to determine the jurisdictional question of public utility.

We are convinced that our former conclusion is right, and we recommend that the opinion heretofore filed be adhered to and the judgment of the lower court affirmed.

By the Court: For the reasons given in the foregoing opinion, the judgment of the district court is

AFFIRMED.