## SIMPKIN v. CITY OF ROCK SPRINGS ET AL*
(No. 1314; June 18, 1925; 237 Pac. 245)

CONSTITUTIONAL LAW—ELECTIONS—MUNICIPAL BONDS—QUALIFICATIONS OF ELECTORS.

1.  Laws of 1925, Chapter 36, providing that only taxpayers or wives or. husbands of owners of real property may vote at bond elections, is invalid so far 'as it relates to elections on propositions to create public debt, required to be submitted to a vote of the people by Section 4 of Article 16 of the Constitution or any other section of that Article when read in connection with Section 2 of Article 6 of the Constitution defining generally the qualifications of electors, the word "people" as used therein meaning all electors.

*See Headnote: (1) 12 C. J. p. 714, 20 C. J. p. 75, 30 Cyc. pp. 1388, 1389.

Heard on reserved questions from the District Court, Sweetwater County; VOLNEY J. TIDBALL, Judge.

Action by Robert Simpkin against the City of Rock Springs and others. The court reserved and certified certain constitutional questions for the decision of the Supreme Court pursuant to Comp. Stats. 1920, Sections 6398-6400. Questions answered.

*Lewis H. Brown, D. A. Preston, Frank Yates, W. L. Walls,* and *Kinkead, Ellery & Henderson* for plaintiff.

The term "any election" as used in the suffrage provisions of the constitution, applies only to election of public officers and to a submission of questions of a governmental

nature; it does not apply to a municipal or school district election at which is submitted only questions concerning the issuance of bonds for public improvement; Art. 1, Sec. 3; Art. 6, Sec. 1 and 2, Const.; Chap. 36, Sec. 1, L. 1925. The purpose of Art. 1, Sec. 3 is to safeguard civil rights and political equality; Winnett v. Adams, (Nebr.) 99 N. W. 681-684; State v. Huston, (Okla.) 113 Pac. 190; Friendly v. Olcott, (Ore.) 123 Pac. 53; People v. Toole, (Colo.) 86 Pac. 224; State v. Collins, (Wash.) 124 Pac. 903; Art. 6, Sec. 2 defines the qualifications of electors generally, but it was intended that the local affairs of quasi-municipal corporations being creatures of the state, should be regulated by the legislature, including the manner and purpose for which they might incur public debt; Art. 1, Sec. 3, the section in question was intended to restrict the contraction of public debt; Carville v. McBride (Nebr.) 202 Pac. 802-805; Menton v. Cook (Mich.) 111 N. W. 94-95; State v. Monahan, 72 Kans. 492; McClintock v. City (Mont.) 163 Pac. 99; the section does not contravene the provisions of the Constitution prohibiting taxation without consent of the people or their representatives; Art. 13, Sec. 1 gives unlimited power and authority to the legislature for the organization of municipalities and Sec. 3 of the same article delegates broad powers in the restriction of public debt; People v. Bartlett, 136 N. E. 654; Kraus v. City, 109 Atl. 226; Village v. Ricker, 129 N. E. 100; In Re Sanitary Board, 111 Pac. 368; Mackaneny v. Board, 134 N. E. 187; Londoner v. City, 119 Pac. 156; People v. Earle, 94 Pac. 294; Art. 16, Sec. 5 prohibits the legislature from granting power to create indebtedness exceeding 2% of the value of taxable property therein; the statute is a compliance with Art. 3, Sec. 3 of the Constitution; State v. Council (Wis.) 71 N. W. 86; Blanding v. Burr, 13 Calif. 343; Curtis v. Co. (U. S.) 16 L. ed. 745; Township v. Morrison, (U. S.) 33 L. ed. 736; Town v. Jenkins, 57 N. Y. 177; Williams v. Town, 66 N. Y. 129; Town v. Webb & Co., 72 S. E. 460; Highway Com. v. Co., 68 N. E. 211; Camp. v. State, 72 So.

483; the real burden of taxation falls upon real estate; personal property is moveable and in many instances escapes taxation; as a matter of policy the condition seems wise; if the power of a municipality to incur debt depends upon the will of the legislature, that body should have power to regulate conditions without restrictions by the court; Kinney v. City, (Ore.) 217 Pac. 840; Slaymaker v. Phillips, 5 Wyo. 453; City v. Stoddard, (Nev.) 167 Pac. 317; College v. Hylan, 199 N. Y. S. 634; the statute does not seem to involve a question of taxation without representation since the electors of Rock Springs were represented in its enactment as well as the enactment of Sec. 2244 C. S.; it is not special or local legislation; it applies to all elections held in counties, towns or cities at which a question of the issuance of bonds is submitted; State v. Sheldon, 29 Wyo. 233; McGarvey v. Swan, 17 Wyo. 120; the court will never declare a statute unconstitutional unless it appears so beyond a reasonable doubt; Swan v. U. S., 3 Wyo. 152.

*Fred W. Johnson, T. S. Taliaferro, Jr.,* and *W. A. Muir* for defendant.

Chapter 36, Laws of 1925 attempts to restrict the qualifications of electors as fixed by Art. 6, Sec. 2 and political rights guaranteed by Art. 1, Sec. 3 of the Constitution. Municipal indebtedness exceeding the current taxes must be voted on by the people, Art. 16, Sec. 4 of the Constitution; the term "people" as used in the constitution means electors as defined therein as those who may vote at elections; Co. v. County (Ore.) 142 Pac. 577; Menton v. Cook (Mich.) 111 N. W. 94; Art. 7, Sec. 23 Const.; Legislature may provide for elections, but does not determine the qualifications of voters; People v. Elkus, (Calif.) 211 Pac. 38; "people" means voters; Art. 16, Sec. 6, Const.; Constitutional Debates 360-374; even property qualifications differ from real estate qualifications; the term "vote of the people" as used in the constitution means electors; Koehler v. Hill, (Iowa) 15 N. W. 609; People v. Draper, 15 N. Y. S.

532; Dupee v. Swigert, (Ill.) 21 N. E. 622; Dred Scott v. Sanford, 60 U. S. 393; Boyd vs. Nebraska, 143 U. S. 135; Walnut v. Wade, 103 U. S. 683; Wyatt v. Larimer, 29 Pac. 906; Scott v. Twombley, 46 N. Y. S. 699; In Re Incurring of State Debts, 37 Atl. 14; Laws of 1890-1891, Chap. 89, 2184 C. S. Harrington v. Town (Minn.) 6 N. W. 780; the votes in controversy would not have changed the result, hence the election was valid; Potter v. Furnish, 128 Pac. 542; Reid v. County, 125 Pac. 429; irrespective of its conflict with the constitution, Chap. 36, Laws of 1925 is capable of practical results quite unjust, absurd and ridiculous viz: an irresponsible husband by making an affidavit that his wife is the owner of real estate however slight its taxable value, may vote, whereas the owner of only personal property but of great value and the heaviest taxpayer in the town would be deprived of the privilege of voting; numerous illustrations, equally absurd, might be suggested, but it seems unnecessary.

POTTER, Chief Justice.

This cause has been heard upon reserved constitutional questions certified by the district court to have arisen in the cause; a proceeding provided for by Comp. Stat. 1920, Sections 6398-6400. It was commenced in the district court in Sweetwater County, under what may be known as the "Declaratory Judgments Act," (Ch. 50, Laws 1923), wherein it is provided, among other things, that any person whose rights, status or other legal relations are affected by a statute may have determined any question of construction or validity and "obtain a declaration of rights, status or other legal relations thereunder." The plaintiff is an alleged duly qualified resident, citizen and elector and the owner of real estate subject to taxation in the city of Rock Springs, in said county of Sweetwater, and he names as defendants the said city, alleged to be a duly incorporated municipal corporation, and certain individuals named respectively as

the mayor and councilmen of said city. The action is explained in the plaintiff's brief substantially as follows:

The gist of the petition is that at a special municipal election held in Rock Springs on March 31, 1925, at which election the question of the issuance of the bonds of said city for the purpose of building a sewerage system was submitted to the electors thereof, the provisions of Chapter 36, Laws of 1925, were not followed in any respect, but entirely ignored,—in that no person voting at said election was required to, or did, produce a tax receipt showing that he or she was a tax payer on real property, and that no person voting at said election was required to or did make oath that he or she was the owner or the husband or wife of the owner of real estate located in said city. That prior to the holding of said election the said officials publicly announced, or caused to be publicly announced, that said Chapter of the Laws of 1925 was unconstitutional and void, and that the ownership of real estate located in said city was not an essential qualification of an elector at said election, but that any person qualified to vote at a general election of public officers was qualified to vote at said election, and that pursuant to said announcement, said election was conducted and held ''in keeping therewith.'' That at said election sundry persons who were not owners of real estate located in said city, or the husband or wife of the owner of any such real estate, voted, and that no person who voted at said election was required to or did produce a tax receipt, or make affidavit, as required by said statute.

And that at said election votes of electors who were not taxpayers on real estate were received and counted was not questioned upon the argument here. When the district court in said cause ordered certain constitutional questions reserved for the decision of this court, the case was pending therein upon a petition, a demurrer thereto by the mayor and councilmen named as defendants, and an answer filed by the city of Rock Springs. The petition sets forth that there had been duly passed and enacted by the council of

said city an ordinance for a special election of all the qualified electors of the city on March 31, 1925, to vote upon the question whether the said council shall be authorized to issue the coupon bonds of the city in the sum of $170,000, said amount not being in excess of 4% of the taxable property in said city for the year 1924, for the purpose of building a sewerage system in said city. That in accordance therewith the mayor issued and published a proclamation for said election, which is set out in full in the petition, stating that there will be a special election on the date above stated "by the qualified electors thereof," for said purpose, and, further, that the sewerage system was proposed to be built under and pursuant to the provisions of Chapter 141, of the 1920 Compiled Statutes, "and any and all acts amendatory or in aid thereof." Said proclamation stated also, "that the said proposed bond issue is in aid of the local improvements described in Resolution No. 231, heretofore enacted by the city council on Thursday, the 5th day of March, A. D. 1925." The petition also sets out the provisions of the act known as Ch. 36, Laws 1925. That act, with the title, reads as follows:

"AN ACT to amend and re-enact Section 1, Chapter 102, Session Laws of Wyoming, 1923, defining the qualifications of electors in Bond Elections.

Be It Enacted by the Legislature of the State of Wyoming:

Section 1. That Section 1, Chapter 102, Session Laws of Wyoming, 1923, be amended and re-enacted to read as follows:

Section 1. No elector shall be eligible to vote for or against any bonds in any regular or special election unless he or she shall produce a tax receipt showing that he or she is a tax payer on real property, or shall make an affidavit upon oath before the election board before which he or she offers to vote, that he or she is the owner, or is the husband or the wife of the owner of real estate in the district, town, county or state proposing to issue such bond.

Section 2.    All Acts or parts of acts in conflict herewith are hereby repealed.

Section 3.    This Act shall take effect and be in force from and after its passage and approval."

Section 1 of Chapter 102 of the Laws of 1923, before this amendment, had provided as follows:

"No elector shall be eligible to vote for or against any bonds in any regular or special election unless he or she shall produce a tax receipt showing that he or she is a tax payer on real property, or a certificate from the County Clerk of the County, that he or she is the owner of real estate in the district, town, county or state proposing to issue such bond."

It is further set out in the petition that said election was held, at which the question above mentioned was submitted to and voted upon by all the electors of the city desiring so to do, in accordance with a public announcement of officers of the city that Chapter 36 of the Laws of 1925 was void. That at said election, divers and sundry persons possessing the qualifications of electors, but not the qualifications as set out in Chapter 36, claimed the right to and did vote, and their votes were received and counted on the question, and that no person voting thereat produced or was required or asked to produce a tax receipt showing that he or she was a tax payer on real property or to make an affidavit before the election board that he or she was such owner or was the husband or wife of the owner of real estate, and that no vote at said election was cast in accordance with said statute, but that it was intentionally disregarded and ignored, under the alleged pretense that it was and is unconstitutional, void, and of no force and effect. That at said election there were cast for the bonds 943 votes and 563 votes against the bonds; and that thereafter the said votes ware canvassed, resulting in a declaration that the question had been carried by those in favor of the issuance of the bonds. It is then

alleged that the city council threatens to and will issue the bonds of the city in the aforesaid sum, which will become a first and prior lien on the plaintiff's real estate in said city.

The demurrer filed by the mayor and councilmen states only the general ground that the petition does not state facts sufficient to constitute a cause of action. The answer of the city contains three defenses. The first denies many of the allegations of the petition, either positively, or because of alleged lack of information or knowledge, and other allegations are admitted. For example: It is denied in the first defense that any of the matters and things set forth in the petition are of public interest, or in any manner involve the property of the plaintiff, or any real estate in said city, or any owner thereof, or that there is involved any question of which the said court has either the jurisdiction to determine, or should determine even if there be jurisdiction. The second defense alleges certain proceedings of the city council with reference to said election and concludes by alleging that the election was held in an orderly manner, that the city has no information of any illegal voting or if any challenging of the vote of any voter because not entitled to vote. The third defense alleges at the outset that if any electors, otherwise qualified to vote, voted as stated in the petition, though they were not owners of real estate, and that thereby they violated the provisions of said Chapter 36 of the Laws of 1925, then the said defendant city alleges that said statute is null and void and unconstitutional, in that it violates the Constitution by abridging the rights and privileges guaranteed to electors in sections 3 and 28 of Art. 1, the article containing the "Declaration of Rights," and that as to electors not owning real estate within the said city, the said act is unconstitutional and void because violating section 27 of Art. 3 of the Constitution of the state, and also because violating sections 1 and 2 of Art. 6 of the Constitution.

The answer then closes with a prayer that said act of 1925 (known as Ch. 36), be declared of no force and effect,

and unconstitutional as against electors otherwise qualified to vote at said election, and especially that said chapter be declared unconstitutional class legislation, and as denying equal political rights and privileges to one class of tax payers in favor of another.

With these pleadings in the cause, the plaintiff filed a motion for an order certifying to this court for its decision certain constitutional questions, viz:

1. Is Chapter 36, Laws of 1925, a constitutional enactment of constitutional legislation? 2. Is said chapter contrary to and in violation of any of the following provisions of the Constitution of the state: Sections 3 and 28 of Art. I, Section 27 of Art. III, Sections 1 and 2 of Art. VI? 3. Is said chapter contrary to and in violation of any other provision of the Constitution of the state not specifically enumerated? Thereupon, the court entered an order certifying each of the questions included in the motion, except the first; the questions being expressed in the order in six separate paragraphs, the first five respectively inquiring as to the validity of the legislation under a particular section of the Constitution, in the order above stated, viz: 1 of Art. I, 28 of Art. I, 27 of Art. III, 1 of Art. VI and 2 of Art. VI; and the Sixth question inquiring whether said statute is contrary to and in violation of any other provision of the constitution not specifically enumerated in the preceding questions. That order contains also recitals to the effect that it appeared to the court that important and difficult constitutional questions are involved in the cause or proceeding; that part of the defendants have filed a general demurrer to the petition, thereby admitting the facts set out therein, and that the defendant city had filed an answer denying certain parts of the petition, but at the same time raising the same constitutional questions involved and, in effect, joining with plaintiff in the prayer of the answer for a declaration upon the constitutional questions involved; and that it appeared further to the court that the validity of the said statute is of great public importance, and that

plaintiff has such an interest as to entitle him to a declaration as to the constitutionality of the said statute of 1925.

Were it not for these recitals in the order we might have just grounds for declining to consider or determine the questions reserved, under our previous decisions where there were other points or issues in the case upon which it might be disposed of without a consideration of the constitutional questions. State v. Kelley, 17 Wyo. 335, 98 Pac. 866; State v. Board, 7 Wyo. 161, 51 Pac. 204. But we think that said recitals may be understood as indicating that all other issues tendered by the demurrer and answer had been considered, leaving the disposition of the cause dependent only upon the reserved constitutional questions. And no other but those questions has been presented in this court.

It should be explained also that we find attached to the answer of the city a certified copy of the several proceedings of the city council with reference to said bond issue and election, wherefrom it appears that for the purpose of constructing a sanitary sewerage system, the total cost of which was estimated to be $425,000, a special assessment district was established by said resolution, which declared also that of said estimated cost, only the sum of $170,000 should be raised under the provisions of Chapter 141, Compiled Statutes 1920, and acts amendatory or in aid thereof, and that the rest of the expense should be raised by local assessments, as provided for in Chapter 129 of said Compiled Statutes,—which, it may be said in passing, provides for local improvements and the levy and collection of assessments on property specially benefitted thereby for the purpose of paying the expense of the same or any portion thereof. Therefore it will be understood that what we may say upon the reserved questions will not be intended as having any application or reference whatever to local municipal improvements under said Chapter 129, or any other statute of a like nature, but only to bonds issued as a general municipal obligation, chargeable, through general taxation, upon all the taxable property in the city.

Most of the provisions of Chapter 141, Comp. Stat. 1920, were enacted in 1890, (L. 1890, Ch. 52) and have been in existence since then without substantial change. The first section (2182) provides that, in addition to other powers, each incorporated city or town shall have power to establish, construct, purchase, extend, maintain and regulate a system of sewerage. Section 2183 authorizes any incorporated city or town to borrow money and issue its coupon bonds, in any amount not exceeding at any time 4 per cent of the assessed value of said city or town, for the purpose of building sewerage therein, and contains provisions regulating the denomination of the bonds, the interest rate, date of maturity, and the sale thereof, and provides also:

"No bonds shall be issued until the proposition to issue the same shall be submitted to the qualified electors of the city or town desiring to issue the bonds. Such proposition may be submitted at any annual election of such city or town, or at any special election called for the purpose," * * *.

The next section (2184) contains provisions enacted at the first legislative session after the state's admission, and evidently intended as a recognition of like restrictions upon indebtedness contained in the Constitution, viz:

"No debt in excess of the taxes for the current year shall in any manner be created by any city or town unless the proposition to create such debt shall have been submitted to the vote of the people, and by them approved. And no city, town or village in the state of Wyoming shall in any manner create any indebtedness exceeding two per cent of the assessed valuation of the taxable property therein, except as provided in this chapter, or for the supplying of said city or town with water."

The law remained in the form as thus enacted, so far as any question here under consideration is concerned, until

the enactment in 1923 of Chapter 102 of the published Laws of that year, defining the qualifications of electors in bond elections as quoted above, which, as above stated, was amended and re-enacted in 1925 by the Act of 1925 in question here. Two of the reserved questions, 4 and 5, inquire concerning the validity of the act when tested by the provisions of the first two sections of Art. VI of the Constitution. That article, entitled "Suffrage," in Sections 1 and 2 thereof provide:

"Section 1. The rights of citizens of the state of Wyoming to vote and hold office shall not be denied or abridged on account of sex. Both male and female citizens of this state shall equally enjoy, all civil, political and religious rights and privileges.

Section 2. Every citizen of the United States of the age of twenty-one years and upwards, who has resided in the state or territory one year and in the county wherein such residence is located sixty days next preceding any election, shall be entitled to vote at such election, except as herein otherwise provided."

Counsel for defendants contend that the quoted provisions, especially those of Section 2, prevents the lawful enactment of the statute here in question. But their principal argument is based upon constitutional provisions not referred to except generally in the reserved questions, to be considered, however, in connection with the quoted provisions of Article VI. On the other hand, it is contended that the provisions of the Constitution defining the qualifications of electors have no application to municipal bond elections, and they cite the following cases in support of that proposition: Carville v. McBride, 45 Nev. 305, 202 Pac. 802; Menton v. Cook, 147 Mich. 540, 111 N. E. 94; Mayor v. Shattuck, 19 Colo. 104, 34 Pac. 947; 41 Am. St. Rep. 208; Spitzer v. Village, 172 N. Y. 285, 64 N. E. 957, 92 Am. St. Rep. 736; Hanna v. Young, 84 Md. 179, 57 Am. St. Rep. 396; State

v. Hanson, 80 Neb. 724, 115 N. W. 294; Coggeshall v. City, 138 Ia. 730, 117 N. W. 309, 128 Am. St. Rep. 221; In Re Carragher, 149 Ia. 225, 128 N. W. 352, 31 L. R. A. (N. S.) 321; State v. Monahan, 72 Kan. 492, 7 Ann. Cas. 661, 84 Pac. 130; Scown v. Czarnecki, 24 Ill. 305, 106 N. E. 276, Ann. Cas. 1915a; Koy v. Schneider, 110 Tex. 369, 221 S. W. 880, 218 S. W. 479; McClintock v. City, 53 Mont. 221, 163 Pac. 99. In the cited Michigan case, it was held, quoting from the syllabus in the official report of the case:

"The submission by the City of Flint to its electors of a proposition to borrow money and issue bonds therefor is not an election within the meaning of section 1 of article 7 of the Constitution, and therefore" the Act "providing that only tax paying electors shall vote on such proposition is not unconstitutional as adding to the qualifications of electors."

In the cited Maryland case it was held that where the constitution authorizes the legislature to create corporations for municipal purposes, and does not prohibit it from imposing any reasonable restriction upon the right to vote, a law providing that the voters at a certain municipal election shall possess a property qualification is valid; and that the word "elections" in the suffrage clause of the constitution providing that every male citizen of the age of twenty-one years and upward who has been a resident of the state for one year, etc., shall be entitled to vote at "all elections," includes only those elections which the constitution itself requires to be held, or those which it has directed the legislature to provide for.

In the New York case of Spitzer v. Village of Fulton, it was contended that a statute authorizing the establishment of a municipal system of waterworks and the issuance of bonds for that purpose was unconstitutional and void because in conflict with the provision of the constitution defining the general qualifications of electors substantially as follows: That every male citizen of the age of twenty-one years, who shall have been a citizen for 90 days, and an in-

habitant of the state one year next preceding an election, and for the last four months a resident of the county, and for the last thirty days a resident of the election district, shall be entitled to vote at such election in the election district of which he shall at the time be a resident, for all officers that may be elective by the people, and upon all questions which may be submitted to the vote of the people.

The statute provided that to entitle one to vote at a village election for an officer he must be qualified to vote at a town meeting of a stated town, and must have resided in the village thirty days next preceding such election; and that to entitle him to vote upon a proposition, "he or his wife must also be the owner of property in the village, assessed upon the last preceding assessment roll thereof." The court said:

"The manifest purpose of this provision (of the statute) was to define the qualifications of electors who should be authorized to vote at the various municipal elections of the defendant for the election of its public officers, and also to define the qualifications they must possess to vote upon the various propositions which should arise as to the business or financial affairs of the municipality."

Referring, then, to the contention that the statute violated the aforesaid constitutional provision, the court said further:

"The obvious purpose of that article (of the Constitution) was to prescribe the general qualifications that voters throughout the state were required to possess to authorize them to vote for public officers, or upon public questions relating to general governmental affairs. But we are of the opinion that that article was not intended to define the qualifications of voters upon questions relating to the financial interests or private affairs of the various cities or incorporated villages of the state, especially when, as in this case, it relates to borrowing money or contracting debts.

This becomes manifest when we also consider section 1 of article 12 of the constitution, which provides: 'It shall be the duty of the legislature to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessments, and in contracting debt by such municipal corporation.' * * * When read together we have two provisions of the constitution which relate to this question. The first was intended merely to define the general qualifications of voters for elective officers, or upon questions which may be submitted to the vote of the people which affect the public affairs of the state; the second, a provision by which it is made the duty of the legislature to protect the tax payers of every city and village in the state, and to restrict their power of taxation, assessment, borrowing money, and contracting debts, so as to prevent any abuse thereby. One is general, relating to the whole state. The other is, in effect, local, relating to the cities and villages of the state. One relates only to the general governmental affairs of the state. The other relates to the business or private affairs of municipalities specified. By the latter section, the manner of restraining municipal corporations from contracting debts and of preventing abuses in that regard is left to the sound discretion of the legislature, and was to be controlled by such legislation as it deemed proper, and which tended to secure that end. What better or more effective method of preventing such abuse and protecting such tax payers could be devised than to restrict the right of voting upon propositions for borrowing money for contracting debts to the persons who are liable to be taxed for the payment of such debts? * * * Not until now, so far as we know, has it been even claimed that such a provision was violative of the article of the constitution defining the general qualifications of electors of the state. Indeed, the established policy of this state has been to limit the right of suffrage as to the business or financial affairs of its various villages to the tax

payers of the municipality, and it has never been its policy to confide their financial affairs to the general voters therein.''

We need not refer specifically to the other cited cases. But it may be assumed that, according to the substantial weight of authority, a general provision in a state constitution defining the qualifications of electors for all elections, or any election, considered alone, does not necessarily apply to municipal bond elections. Such provision in our constitution, however, cannot be considered alone, for the purpose of determining the question now before us, for there are other provisions in that instrument relating specifically to municipal debts which cannot be ignored. The New York case aforesaid has been quoted from at some length for the reason, first, that it is peculiarly in point upon the contentions of plaintiff's counsel here, though there is a very substantial distinction between the situation presented in that case and in this, and for the further reason that it recognizes and applies the principle that the general provision in the constitution defining the qualifications of electors should be read in connection with pertinent provisions in the same instrument controlling the matter of municipal indebtedness. Such other constitutional provisions in the cited case were found to sustain the view confining the application of the provision defining electoral qualifications within a field excluding municipal bond elections. And counsel for plaintiff here seem to rely strongly upon a provision of our Constitution somewhat like the provision referred to in said New York case, empowering the legislature to restrict the municipal power to borrow money and contract debts. That provision is found in Section 3 of Article XIII of our Constitution, under the title ''Municipal Corporations.'' The section reads as follows:

''The legislature shall restrict the powers of such corporations to levy taxes and assessments, to borrow money and contract debts, so as to prevent the abuse of such pow-

er, and no tax or assessment shall be levied or collected or
debts contracted by municipal corporations except in pur-
suance of law for public purposes specified by law.''

But in our Constitution there are still other provisions
relating to the same matter, which must be considered. And
they are the provisions upon which the contentions of de-
fendants are principally based, in connection with the pro-
vision aforesaid defining generally the qualifications of elec-
tors. They are found in Article XVI, entitled ''Public In-
debtedness.'' Section 4 thereof is particularly relied upon,
but it may be considered with Section 2. We quote the two
sections in the order in which they are found in the Article:

''Section 2. No debt in excess of the taxes for the current
year, shall in any manner be created in the state of Wyo-
ming, unless the proposition to create such debt shall have
been submitted to a vote of the people and by them ap-
proved; except to suppress insurrection or to provide for
the public defense.''

''Section 4. No debt in excess of the taxes for the cur-
rent year shall, in any manner, be created by any county
or subdivision thereof, or any city, town or village, or any
subdivision thereof in the state of Wyoming, unless the pro-
position to create such debt shall have been submitted to a
vote of the people thereof and by them approved.''

Section 5 of the same article is also in point because it ex-
pressly limits the total debt of any city, town or village,
and to that extent necessarily qualifies the legislative power
granted by section 3 of Article XIII aforesaid. It pro-
hibits any city, town or village, or any subdivision thereof,
or any subdivision of any county, from creating any indebt-
edness exceeding two per centum of the assessed value of
the taxable property therein, with the proviso, however,
that debts for supplying water to any such city or town are
excepted therefrom, and that any city, town or village may

be authorized to create an additional indebtedness, not exceeding four per centum "for the purpose of building sewerage therein."

The point of the contention upon the provision of section 4 of Article XVI is of course that since it prohibits the creation of any municipal debt in excess of the taxes for the current year *unless* the proposition to create such debt *shall have been submitted to a vote of the people thereof and by them approved,* the legislature is without power to dispense with that condition, either expressly or by confining the right of electors to vote upon such a proposition to those who are tax payers upon real estate, as the statute in question attempts to do.

We agree with the argument in support of the point that the provision requiring a submission of the proposition to a vote of the people is to be understood as meaning a submission of the question to a vote of the electors.   Walnut v. Wade, 103 U. S. 683; 26 L. ed. 526; Foxworthy v. L. & F. Ry. Co., 13 Nebr. 398; 14 N. W. 394; Beverly v. Sabin, 20 Ill. 357; Blair v. Ridgely, 41 Mo. 63, 97 Am. Dec. 248; Bryan v. City of Lincoln, 50 Nebr. 620, 35 L. R. A. 752, 70 N. W. 252; Rogers v. The Mayor, 88 Ky. 502; Tolbert v. Long, 134 Ga. 292, 67 S. E. 826, 137 Am. St. Rep. 222. It was said in Illinois, in Beverly v. Sabin: "Some criticism has been made because the word *people* instead of the word *voters* is used.   We cannot doubt that this word, as here used, means voters, or the people who are entitled to vote in the district."   And in Nebraska, in Foxworthy v. Railway Co: "The people of a municipal corporation within the territorial limits of the county cannot be called the people of the county in the sense of a political body or organization, and yet I think that the legislature used the words 'the vote of the people of the county,' as the equivalent of the words 'a popular election in the county.'"   So it was held in the Missouri case of Blair v. Ridgely that the *people* for political purposes must be synonymous with qualified voters.   In Walnut v. Wade, the Supreme Court

of the United States, construing a statute authorizing any incorporated city or township situated as described in the act to subscribe to the stock of a railway, the proposition having been first submitted to "the inhabitants" thereof and "approved by them," held that the word "inhabitants" as so used in the statute meant "legal voters," and said:

"The popular signification of the words 'people of a town,' and 'inhabitants of a town' is the same; so that, according to the finding of the court, the bonds recited on their face a substantial compliance with the requirements of the statute. * * * The findings of the court show, that the 'voters' of said town * * * voted in favor of the proposition * * * We think that, by a fair construction of the act, this was all that was necessary."

Under an act of Georgia providing that it should not go into effect until "ratified by the people of the county" it was held, in Tolbert v. Long, supra, that said referendum was "to the people, who, under the organic law, are entitled to vote."

In Scott v. Twombley, 46 N. Y. Supp., 699 20 App. Div. 535 it was said:

"There can be no reasonable question as to who are the electors of the village, or of any political division of the state. The term is of frequent use in the constitution and statutes. They are the citizens of the state who, under the constitution and statutes, are entitled to vote at elections for public offices. By section 13 of title 2. of the general act for the incorporation of villages it was provided that no person should vote at a village election upon a proposition to raise or appropriate a tax or purchase property unless at the time he or his wife was the owner of property assessed on the last preceding assessment roll. This provision substantially enacted that no one but a tax payer should vote on a proposition to levy a tax or purchase property; *but it did not assume to, nor did it in fact, vary or affect the defini-*

*tion of the term 'electors.'* It merely prescribed that certain electors only should vote on certain questions." And that is true as to the statute before us.

The point to be decided in the case was whether a non-taxpayer of the village might vote upon a proposition to acquire a park under a statute authorizing villages to acquire parks on a majority vote of the "electors of the village," while the general village statute had provided that only taxpayers could vote, though no power to acquire a park was conferred by that statute, and the separate statute aforesaid granting the power upon a vote of "electors" did not incorporate in it the provisions of the general village act. And it was held that the court was not "justified in giving any other meaning to the term 'electors of the village' found in the later act than the natural and accurate one."

The case of In re Incurring of State Debts, 37 Atl. 14, decided by the Supreme Court of Rhode Island, seems to be peculiarly in point upon the contentions here. It was decided upon an application by the Governor to the Supreme Court for an opinion respecting the power of the state to incur debts, in view of a provision of the constitution that the general assembly shall have no power "without the express consent of the people" to incur such debts to an amount exceeding $50,000, except in time of war, or in case of an insurrection or invasion. Among other things, the court said:

"Does the word 'people' as used in said section, mean the tax payers and the registry voters,—in other words, all the electors,—or does it mean the tax payers alone, in accordance with a proviso at the end of article 7, § 1, in amendment of article 2, § 2, to-wit, that 'no person shall at any time be allowed to vote * * * upon any proposition to impose a tax, or for the expenditure of money, in any town or city, unless he shall within the year next preceding,

have paid a tax assessed upon his property therein valued at least at $134.' The constitution, in its preamble, starts out 'We, the people of the state,' etc. In article 1, § 2, it is declared that all governments are instituted for the protection, safety, and happiness of the people. In the same article, Sec. 6, it is further declared that the right of the people to be secure in their persons, papers, and possessions against unreasonable searches and seizures shall not be violated. And again, in Sec. 17 : 'The people shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore, to which they have heretofore been entitled under the charter and usages of the state,'' etc. These illustrations (and others might be given) show that the term 'people' as used in the constitution is broad and comprehensive, comprising in most instances all the inhabitants of the state. Article 2, as amended by article 7, however, defines the qualifications necessary for electors ; and, inasmuch as the constitution provides no mode for obtaining the consent of the people except by the expression of it through the votes of the electors, we think that the consent of the people mentioned in article 4, § 13, means the consent of the electors manifested by the majority of their votes. We find nothing to warrant its restriction to such of the electors as are taxpayers, and we are of the opinion, therefore, that the word 'people' in the section under consideration, is to be construed to include registry voters, as well as taxpayers.''

It appears from Wicks v. Salt Lake City, 208 Pac. 538, that the Utah constitution contains provisions, like those found in Section 16 of our constitution, limiting the amount of indebtedness that may be created by any city and also prohibiting the creation of any debt in excess of the taxes for the current year ''unless'' the proposition to create the debt is first submitted to a vote of the qualified electors. And the Supreme Court of Utah, in the case cited, took occasion to remark: ''It must be conceded that these pro-

visions, like every other provision of the constitution, are the paramount law of the state concerning the subjects to which they relate. Any law enacted by the legislature in conflict therewith is null and void.'' But the question before us here was not involved in that case, and it is referred to merely because of its recognition of the controlling effect of the constitutional provision for submitting a proposition to create a debt to the vote of the people or the electors.

The word ''people'' is used in our constitution with respect also to a vote upon other matters than the creation of a debt. For example: it is provided in Section 6 of Article XVI that the state shall not engage in any work of internal improvement unless authorized by a two-thirds vote of the people. The matter of highway construction has been excepted from that provision by an amendment contained in what is now known as Section 9 of said article, but the provision is retained as to other works of internal improvement. It was and is provided in Section 23 of Article VII, under the sub-heading ''Public Buildings,'' that the legislature shall have no power to change or locate the seat of government, the state university, the insane asylum, or state penitentiary, but may, after the expiration of ten years after the adoption of the constitution, provide by law for submitting the question of the permanent locations thereof respectively ''to the qualified electors of the state'' at some general election. In section 4 of Article XII, under the title ''County Organization,'' it is provided that the legislature shall provide by general law for a system of township organization and government, which may be adopted by any county whenever a majority of the citizens thereof voting at a general election shall so determine. And in Section 2 of the same article, that no county shall be divided unless a majority of the ''qualified electors'' of the territory proposed to be cut off voting on the proposition shall vote in favor of the division. Using the word ''electors'' instead of ''people,'' and we have shown that they mean the

same thing with reference to the matter of voting, it is provided also in Section 2 of Article XIII that no municipal corporation shall be organized without the consent of a majority of the "electors" residing within the district proposed to be so incorporated, such consent to be ascertained in the manner and under such regulations as may be prescribed by law.

The word "electors" instead of "people" is used also in the provisions for amending the constitution (Article XX, Section 1), wherein proposed amendments are required to be submitted "to the electors of the state," and it is declared that "if a majority of the electors" shall ratify the same, such amendment or amendments shall become a part of the constitution; and also that if two or more amendments are proposed at the same time they shall be submitted in such manner that the "electors" shall vote for or against each of them separately.

The statute in question purports to declare who of the general body of "electors" shall be entitled to vote upon a proposed bond issue of the state as well as of a town or county.

If the legislature should be held authorized to define or limit electors upon a bond issue, as proposed by the statute here challenged, so as to permit the submission of the question to those only who are taxpayers, or taxpayers upon real property, it might be found difficult to prevent the rule or principle of a decision to that effect from being applied so as to authorize legislation limiting in the same manner the body of electors entitled to vote upon a proposition either to organize a municipal corporation, divide a county, or for the state to engage in a proposed work of internal improvement now prohibited unless authorized by a two-thirds vote of the people, or even upon a proposition to amend the constitution, notwithstanding that, as to either of those matters, the reasons might not apply that are usually suggested or accepted as sufficient to justify limiting the body of electors at municipal bond elections to those who are tax-

payers.   Contemplating the possibility of some such question arising, if this statute should be upheld, it would, perhaps, be pertinent to inquire as to the existence of any reasonable ground of public policy upon which it might be insisted that only those who are taxpayers upon real property should be permitted to vote upon a proposition to issue state bonds for the purpose of highway construction or maintenance, thereby excluding from the electorate all other electors, regardless of the amount they might pay in taxes upon live stock, farm implements, mechanics' tools, automobiles and other vehicles of transportation, railroad properties, oil, coal and other mineral production, many of whom, no doubt, would not only be equally interested with real estate taxpayers in the convenience afforded by the highways so constructed and maintained, and their welfare equally promoted or injured by the result of such an election, and who might also be subject to taxation to pay the interest and principal upon any such bond issue.   And it would seem, at least as to a vote upon a proposed constitutional amendment, no such power was intended to be conferred upon the legislature.   But we cannot assent to the view that a mere question of public policy concerning who should or should not be permitted to vote upon a bond issue, municipal or state, is of any controlling effect in the determination of the questions propounded here.

The statute under which these bonds are proposed to be issued (Ch. 141, C. S. 1920) shows upon its face a legislative construction of the provision in Article XVI for a submission of the question of creating a municipal debt to a vote of the people, since it expressly provides, as a condition precedent to the issuance of bonds, that the proposition be submitted to a vote of the "electors" of the municipality (Sec. 2183), and also, in the next succeeding section (2184), that no debt in excess of the current year's taxes shall be created unless the proposition be submitted to a "vote of the people."   And the legislature has also more recently placed its construction upon the meaning of the provisions

in Article XVI for submitting to a vote of the people the question of creating a debt on the part of the state in excess of the taxes for the current year, except to suppress insurrection or to provide for the public defense. Since the adoption of the amendment to the constitution authorizing the state to engage in the work of highway construction, an act has been passed providing generally for the issuance of bonds for the purpose of carrying on such work. Laws 1919, Ch. 82; C. S. 1920, §§ 3020-3024. And, at the same legislative session, an act was passed providing for the calling of a special election to submit "to a vote of the people" the proposition to create a state debt for such purpose through the issuance of state bonds. Laws 1919, Ch. 102. At the next succeeding session of the legislature, another act was passed also authorizing the submission of a like question, in the same manner, at another special election. Laws 1921, Ch. 97.

Assuming that the legislature might *add* to the restrictions contained in the constitution upon the question of municipal debt, by, for example, requiring also the consent of a majority of real estate owners or taxpayers, to be expressed either by petition or referendum vote, or in some other manner, as a condition to authority for the issuance of the bonds as proposed, as we may suppose they might do, that is not the purport nor the effect of the statute in question. The general statute (Ch. 141, C. S. 1920) conferring authority to issue municipal bonds for the purpose for which the bonds in question in this case are proposed to be issued, has expressly provided, as above stated, for a submission of the question to a vote of the electors. But the act here challenged does not purport to be an amendment of that statute. On the contrary, it allows it to stand with said provision for a submission of the question to the electors. As determined by its title, as well as by the language found in the body of the act, this act of 1925 purports merely to define the *qualifications of electors* in bond elections.

The provisions of section 3 of Article XIII commanding that the legislature restrict the municipal power to borrow money and contract debts so as to prevent its abuse cannot be held to grant general authority independent of the provisions in Article XVI limiting not only that power but also legislative power over the matter. By no fair process of reasoning can said provision of Article XIII be held to render inoperative the positive requirements of Article XVI that no debt as therein described shall be created unless the proposition shall have been submitted to a vote of the people and by them approved. This conclusion, based upon a consideration of section 2 of Article VI, section 3 of Article XIII, sections 2 and 4 and other related sections of Article XVI of the Constitution, renders it unnecessary to consider the reserved questions as to the validity of the act under other stated sections of the Constitution.

We shall therefore return an answer to the reserved questions as follows: That Chapter 36, Laws of 1925, so far as it relates to elections upon a proposition to create a public debt required to be submitted to a vote of the people by Section 4 of Article XVI of the Constituiton, or any other section of that article, is contrary to and in violation thereof, read in connection with Section 2 of Article VI, defining generally the qualifications of electors, and therefore, to that extent at least, said statute is unconstitutional and void.

BLUME and KIMBALL, JJ., concur.